SunAMERICA CORPORATION (formerly Sun Life Group of America, Inc.), a Delaware Corporation, and Sun Life Insurance Company of America, a Maryland Corporation, Plaintiffs,

v.

SUN LIFE ASSURANCE COMPANY OF CANADA, a Canadian Corporation, and Sun Life Assurance Company of Canada (U.S.), a Delaware Corporation, Defendants.

Civ. A. No. 1:89–CV–1315–JTC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 24, 1994.

Miles J. Alexander, Jerre B. Swann, Virginia S. Taylor, Matthew John Mitten, Dean Wall Russell, Kilpatrick & Cody, Atlanta, GA, Richard C. Browne, Bishop Cook Purcell & Reynolds, Washington, DC, Susan L. Harris, Broad, Inc., Los Angeles, CA, for Sun-America Corp.

Martin J. Elgison, Oscar N. Persons, Randall Lee Allen, James Jay Wolfson, Reta Gail Jordan, Alston & Bird, Atlanta, GA, Bingham B. Leverich, Steven Semeraro, Judith Sapp, Kathleen T. Gallagher–Duff, Covington & Burling, Washington, DC, David C. Hilliard, Joseph N. Welch, Brett August, Pattishall McAuliffe Newbury, et al., Chicago, IL, for defendants Sun Life Assur. Co. of Canada.

### ORDER OF THE COURT

CAMP, District Judge.

This trademark action came before the Court for a non-jury trial during November and December, 1993. The trial record contains well over a thousand pages of live and deposition testimony, the controversial results of a joint survey, and many volumes of exhibits documenting the evolution of this conflict since 1916. Having carefully considered the evidence presented, the arguments of counsel, and the relevant law governing the parties' claims, the Court makes the following findings of fact and conclusions of law.

## TABLE OF CONTENTS

FINDINGS OF FACT

I. Background ........................................ 1563
 A. The Parties ................................. 1563
 B. Claims and Counterclaims .................... 1564
 C. Decision on Appeal .......................... 1564

II. History of the Parties and Their Names ......... 1564
 A. The Early Days of Cooperation ............... 1564

B. Expansion and Conflict 1566
C. An Incomplete Accommodation 1567
D. Hostilities Resume 1568

III. The Joint Survey 1570

IV. Likelihood of Confusion 1573

CONCLUSIONS OF LAW

V. Defendants' Counterclaim 1577

VI. Plaintiffs' Acquiescence Defense 1577

VII. Inevitable Confusion 1579

VIII. "Sun Financial" Group and Services 1580

IX. Miscellaneous Matters 1582
A. Defendants' Other "Sun" Marks 1582
B. Plaintiffs' State Law Claims 1582
C. The "SunAmerica" Counterclaim 1582
D. Attorney's Fees 1582

X. Conclusion 1582

## FINDINGS OF FACT

### I. BACKGROUND

Plaintiffs filed this trademark infringement action charging Defendants with violations of the Lanham Act and various state laws concerning trademark protection. Both Plaintiffs and Defendants currently use corporate names, trade names, and service marks featuring the term "Sun Life." Plaintiffs claim that Defendants recently began to use the names "Sun Life (U.S.)" and "Sun Life" prominently in advertising without any proximate reference to "Canada." Such use, said Plaintiffs, is confusing to consumers. At trial, Defendants did not deny the likelihood of confusion, but contended that the parties' simultaneous use of the salient phrase "Sun Life," even if modified by geographic terms such as "of America" or "of Canada," is inevitably confusing.

On motions for summary judgment, this Court ruled that Defendants' use of "Sun Life (U.S.)" presented a substantial likelihood of confusion with Plaintiffs' mark "Sun Life of America." *See* Order [# 137], entered June 10, 1991. The Court enjoined Defendants from further use of the "Sun Life" name without the geographic modifier "of Canada." *See* Order [# 143], entered August 22, 1991. On September 9, 1992, the Eleventh Circuit vacated this Court's injunction and remanded for further proceedings. *See SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 24 U.S.P.Q.2d 1505, 974 F.2d 1348 (11th Cir.1992) (per curiam). The case came to trial on November 15, 1993.

### A. The Parties

Plaintiffs are an American holding company, SunAmerica, Inc. ["SunAmerica"] and its wholly-owned subsidiary, Sun Life Insurance Company of America ["Sun Life of America" or "SLA"]. Defendants are a Canadian mutual life insurance company, Sun Life Assurance Company of Canada ["Sun Life of Canada" or "SLC"] and its wholly-owned U.S. subsidiary, Sun Life Assurance Company of Canada (U.S.). Both parties presently are in the business of selling annuity products to American consumers. Both Plaintiffs and Defendants have used the service mark "Sun Life" alone or in combination with geographic modifiers and other descriptive terms for over seventy-five years.

### B. Claims and Counterclaims

Sun Life of America challenges both Sun Life of Canada's use of "Sun Life (U.S.)" as a name for its U.S. subsidiary and SLC's federal registration of "Sun Financial Group." Plaintiff SLA further alleges unfair competition and trademark infringement under federal law, common law trademark infringement and unfair competition, and deceptive trade practices and false advertising under state law. SLA also seeks the cancellation of federal registration for various other marks used by Sun Life of Canada.[1]

Sun Life of Canada filed a counterclaim asserting that Plaintiffs are infringing Defendants' rights in the unmodified term "Sun Life." In addition, SLC wants the Court to cancel registration of Plaintiffs' "SunAmerica" marks.

### C. Decision on Appeal

As noted, the Eleventh Circuit Court of Appeals vacated this Court's permanent injunction against Defendant SLC's use of "Sun Life (U.S.)" and remanded the case for trial. The Court of Appeals determined that this Court had failed to explicitly resolve the issues raised by SLC's counterclaim. Defendants argued that SLA did not have enforceable trademark rights in the "Sun Life of America" name, a prerequisite to a claim under section 43(a) of the Lanham Act. Thus, the Court must begin with an analysis of SLC's prior use of "Sun Life" and the legal effect of that use. In a concurring opinion, Judge Birch suggested an analytical framework for resolving the complex factual and legal issues presented on remand.

The Court will first determine whether Defendant SLC can demonstrate both enforceable rights in its "Sun Life of Canada" mark and that Plaintiffs' use of "Sun Life of America" generates a likelihood of confusion. The Court will next consider SLA's affirmative defense of acquiescence. In this regard, "[a]cquiescence would estop Sun Life of Canada from extinguishing SunAmerica's use of 'Sun Life of America,' unless there is an inevitability of confusion between the two marks." Id. at 1510. If confusion is inevitable, the public interest may require that Defendant's claim to the "Sun Life" name be revived, regardless of acquiescence. As for SLA's claim that Defendants' "Sun Life (U.S.)" is confusingly similar to "Sun Life of America," the Court will first decide whether SLA has a protectable trademark interest in the "Sun Life of America" name before reaching the issue of confusion.

The evidence presented at trial and the applicable law suggest that two basic issues dispose of the principal claims in this action:

(1) Whether Sun Life of Canada acquiesced in Sun Life of America's use of its "Sun Life" name; and

(2) Whether there is an inevitability of confusion between the two marks.

## II. HISTORY OF THE PARTIES AND THEIR NAMES

### A. The Early Days of Cooperation

Defendant Sun Life Assurance Company of Canada was founded in Montreal, Canada in 1865 and adopted its present name in 1882. SLC pioneered several highly successful innovations in the life insurance field, grew steadily, and by the 1890's was one of the leading Canadian life insurance companies. The company opened its first branch office in the United States in 1895. Employees known as "career agents" began selling life insurance in the United States under the "Sun Life of Canada" name in 1895 and

---

1. When this litigation began, Defendants had registered fourteen "Sun" and "Sun Life" marks:

| Mark | Registration |
| --- | --- |
| *"Sun Life of Canada" plus design | June 20, 1967 |
| *"Follow the Sun for Life" | June 20, 1967 |
| *"Sun Fund" | July 13, 1971 |
| *"Sun Fund" plus design | Sep. 21, 1971 |
| *"SunPlan" | Apr. 21, 1981 |
| *"Sun Life of Canada" (stylized) | Aug. 4, 1981 |
| "Sun LifeMaster" | Mar. 27, 1984 |
| "SunPlan 2" | Apr. 10, 1984 |
| "Sun InterestMaster" | Apr. 30, 1985 |
| "Sun InterestMaster–Q" | Oct. 8, 1985 |
| "Sun Execumaster" | Apr. 29, 1986 |
| "Sun UltraTerm" | Mar. 17, 1987 |
| "Sun Financial Group" | Apr. 21, 1987 |

See DX 317, 839. Registrations preceded by an asterisk * are incontestable, pursuant to 15 U.S.C. § 1065.

Plaintiffs' only federally registered "Sun" marks are the "SunAmerica" marks it purchased from Chemical Bank in 1989.

annuities at least as early as 1902. By 1915, a respected reporting source described Sun Life of Canada as follows:

> The company has built up a large income and operates in a widely extended territory.... The company is very strong financially.... Its actuarial methods are conservative and sound. The investments are sound and remunerative.... This company specializes on annuities and transacts a very large business under that plan.

Best's Insurance Reports,[2] Defendants' Exhibit ["DX"] 914 at 1916–1917 tab. SLC has used the name "Sun Life" as an abbreviation for its full name in promotional advertisements since at least May 18, 1914. See DX 648. The parties do not dispute that Defendant was the first user of the "Sun Life" service mark for insurance products in the United States.

Plaintiff Sun Life Insurance Company of America was founded in Baltimore in 1890 and was incorporated in 1897 as "Immediate Benefit Life Insurance Company." SLA began operation as a "debit company," selling small denominations of industrial life, health and disability insurance policies to low income workers through home service agents. These employees, also called "debit agents," personally visited policyholders and collected the premium payments on a weekly or monthly basis. The company officially adopted the name "Sun Life Insurance Company of America" in 1916.

Although SLC immediately protested SLA's name change, the American company's charter already had been amended. In a letter dated April 26, 1916, SLC conceded: "Under the circumstances, there is nothing to be done in the matter, but to endeavor as far as possible, to avoid any confusion through this similarity of names." PX 77.

Both companies grew dramatically during the succeeding decades. Sun Life of Canada, many times larger than Sun Life of America, rapidly expanded its business throughout the United States.[3] In contrast, SLA concentrated on developing business in the Middle Atlantic states. Historically, SLC sold its products to a broader base of upper income, investment-oriented customers, while SLA focused on selling smaller denominations of industrial insurance to low income workers. As the two companies moved through the first half of the twentieth century, however, their products, customers, and distribution methods began to converge.

By the 1920's, SLA had expanded its lines of business to include relatively small amounts of ordinary life insurance and annuities sold by independent general agents. During the 1930's and 1940's, the importance of industrial insurance diminished as consumers' interest in ordinary life insurance grew. In 1952, SLA created a general agency division and by 1963 derived the majority of its premium income from the sale of ordinary life insurance. Ten years later, industrial premiums accounted for only about 20% of SLA's total premiums, but annuity premiums had grown to about one-third.

During the first half of the century, Sun Life of Canada further enhanced its reputation by expanding profitable operations over a world-wide territory. During the 1950's and 1960's, annuity premiums remained a steady component of its corporate income. By 1973, total annuity premiums were $42 million compared to life premiums of $342 million.

Both companies continued their U.S. expansion. By 1973, SLA was licensed in 41 states and SLC in 45 states. For the most part, relations between the companies were cordial. For example, a number of states required consent by the first registered in-

---

2. Best's Insurance Reports is the universally acknowledged authority on insurer reporting and insurance company ratings, recognized by both parties as the industry "Bible."

3. Best's annually reports the total amount of "Insurance in Force," one measure of the relative size of the two companies:

| Year | SL Canada | SL America |
|------|-----------|------------|
| 1915 | $255 mil. | $ 11 mil. |
| 1930 | $2.8 bil. | $100 mil. |
| 1940 | $3.0 bil. | $144 mil. |
| 1950 | $4.5 bil. | $285 mil. |
| 1960 | $9.5 bil. | $869 mil. |
| 1970 | $19.0 bil. | $1.5 bil. |
| 1980 | $59.7 bil. | $2.9 bil. |
| 1987 | $170.8 bil. | $6.1 bil. |

See Defendants' Exhibit 914.

surance company in the state as a prerequisite to allowing the second company to conduct business there. In every instance in which the two companies sought to expand into the same states, the first registered company—typically SLC—gave its consent to the second company seeking registration. *See, e.g.,* PX 126 (Delaware, 1953); PX 127 (Florida, 1959). Where SLA was the first insurance company in a state, it indicated its willingness to reciprocate. *See, e.g.,* PX 131 (New Mexico, 1968); PX 135 (Maryland, 1974).

## B. *Expansion and Conflict*

The decade of the 1970's marked the beginning of a new era in the business and relations of both parties. In 1970, SLC formed a wholly-owned subsidiary, "Sun Life Assurance Company of Canada (U.S.)," for the specific purpose of issuing variable annuity products. In the same year, this newly created business established its own broker-dealer subsidiary ["SUNESCO"] to sell registered investment products.[4] SUNESCO opened 30 to 35 offices throughout the United States, staffed by a total of 300 registered representatives who sold SLC annuities and third party mutual funds to the public. During this period, SLC also increased its media advertising in an attempt to bolster public recognition of the company. SLC began using "Sun Life (U.S.)" as an abbreviation for the full name of its U.S. subsidiary in 1973. *See* DX 826, 863.

Meanwhile, the owners of Sun Life of America sold the company to home-building conglomerate Kaufman & Broad, Inc. in 1971. Thereafter, SLA also embarked on a plan to develop innovative financial products and new channels of distribution. In 1972, after the New York Stock Exchange modified its rules to allow member firms to sell insurance products, SLA began a campaign to sell single premium deferred annuities to the public through independent broker-dealers.

In 1973, SLA entered into general agency sales agreements with several large brokerage firms. This new distribution strategy met with increasing success. Broker-dealers sold approximately $3.5 million of SLA's "Sun Annuity" product in 1973. From 1973 to 1982, SLA had average annual annuity sales of $16 million through independent broker-dealers. In 1983 and 1984, annuity sales reached $51 and $67 million respectively. Total sales increased dramatically to $255 million in 1985 and averaged more than $300 million per year through the remainder of the decade. Broker-dealers consistently accounted for a material portion of the company's total annuity sales.

During the time that SLA's broker-dealer distribution effort was beginning to take form in 1973, identification problems already had surfaced concerning the similarity of company names. On August 21, 1973, SLC asked SLA to incorporate "of America" in SLA's advertising:

> With increasing frequency we are receiving reports from our field offices that advertising placed by Sun Life of America is contributing to the confusion over the similar names of our companies.... I think we have to expect that there will always be some degree of confusion over identification since the public is certain to abbreviate, even when we don't. The words "of Canada" are a prominent part of our corporate logo, however, and we would appreciate it if your advertising and public relations departments could be made aware of the importance of giving the words "of America" equal prominence in your printed materials.

PX 797. SLA indicated its willingness to comply with Defendant's request: "Please be assured that all future advertisements and public announcements by our Company will be prepared in such a way as to eliminate any possible confusion between our Company and your Company."[5] PX 798, dated August 23, 1973.

---

**4.** Variable annuities are "securities" and can be sold to the public only by a "registered representative," a person licensed by the National Association of Securities Dealers [NASD]. Registered representatives, commonly called "brokers," sell other types of securities as well, including mutual funds. SUNESCO was registered as a broker-dealer and became an NASD member firm.

**5.** This informal agreement to use geographic modifiers seems to have remained in effect for sev-

Plaintiff expanded more aggressively in the following years. In 1978, Kaufman & Broad acquired an insurance holding company that owned Coastal States Life Insurance Company and Universal Guaranty Insurance Company. The name "Sun Life Group, Inc." was adopted to reflect the association of these companies with Sun Life of America.

Defendants were fully aware of the likelihood of public confusion caused by this similarity of names. In a letter dated February 19, 1979, SLC's general counsel protested that SLA's use of the name "Sun Life Group" with no geographic modifier "could cause confusion or misunderstanding by the general public." PX 78. In a follow-up letter in June, Sun Life of Canada threatened legal action. SLA responded, disputing that the new name infringed on SLC's existing name and denying the danger of public confusion: "Since the phrase 'Sun Life' has been continuously used to describe our life insurance business since 1916, we believe that at this time our right to continue to use this phrase has been perfected by the substantial passage of time." PX 81, dated July 19, 1979. Defendant strongly disagreed with this contention:

> Contrary to your opinion that such use has been perfected by the passage of time, it is our opinion that the use of the name "Sun Life Group" just came into being with your acquisition of Coastal States etc. As such, it is our position that the use of the name "Sun Life Group, Inc." is confusing to the public because of its similarity to Sun Life Assurance Company of Canada.

PX 82, dated July 27, 1979. SLC again threatened suit to remedy the "strong likelihood of confusion or of misunderstanding by the public as to the affiliation, connection or association of Sun Life Group with Sun Life Assurance Company of Canada." *Id.*

C. *An Incomplete Accommodation*

The two companies subsequently resolved their differences and signed a Settlement Agreement on May 30, 1980 [the "1980 Agreement"]. *See* PX 83. The 1980 Agreement provided that SLA would not use the name "Sun Life Group" without inclusion of the traditional geographic modifier "of America." In return, SLC agreed not to oppose SLA's adoption of "Sun Life Group of America" as its corporate name.

It is important to note that the 1980 Agreement was limited to the issues involving Sun Life of America's use of "Sun Life Group" and did not cover a wider range of issues pertaining to other similar names and marks used by the parties in promotional activities. Consequently, the 1980 Agreement did not prevent further controversy surrounding the use of "Sun Life."

Late in 1981, SLC became aware of an annuities advertisement distributed by one of SLA's general agents, apparently without authorization by Sun Life of America. The brochure prominently featured the term "Sun Life" standing alone. Counsel for SLC wrote SLA on November 4, 1981, to complain about SLA's use of "Sun Life" without a geographic modifier. "The likelihood of confusion is overwhelming," said SLC, "[w]e strenuously object to this infringing use of our registered mark." PX 84, dated November 4, 1981. When no answer was received, SLC once again threatened litigation over SLA's "Sun Life" advertisement. PX 85, dated January 20, 1982. After further correspondence, SLA indicated that it would be willing to use "Sun Life" in conjunction with its full corporate name if SLC would do the same. PX 88, dated March 19, 1982. SLA proposed a meeting to resolve the conflict. Legal representatives of the two companies met in Washington D.C. in April, 1982, and reached a general understanding that reference to the full corporate name, including geographic modifiers, should be made within the body of any written piece distributed by either company.

Meanwhile, Defendant SLC acquired Massachusetts Financial Services Company ["MFS"] in 1981. MFS was a registered broker-dealer and a long established whole-

eral years. On July 27, 1979, Sun Life of Canada's counsel wrote to Sun Life of America's counsel that: "Over the years we have had a good relationship with Sun Life of America. As recently as 1973 we had conversations with counsel for Sun Life of America wherein it was agreed that "of America" would appear prominently as part of their name." PX 82.

saler of investment products.[6] MFS had its own mutual fund sales force, as well as extensive relations with numerous broker-dealer firms throughout the country. MFS immediately began marketing SLC's annuity products through its broker-dealer channels.

MFS produced advertising brochures featuring the name "Sun Life (U.S.)" as a short form of "Sun Life of Canada (U.S.)." Following the Washington meeting in 1982, but before a draft of the proposed agreement was circulated, SLA objected that MFS's use of "Sun Life (U.S.)" was likely to be confused with "Sun Life of America." PX 95, dated June, 1982. Counsel for Sun Life of Canada responded that SLC's use of "Sun Life (U.S.)" in the MFS brochure was within the general understanding reached in Washington. PX 96, dated July 1, 1982. SLA disagreed, insisting that merely revealing the corporate affiliation as a part of the internal text was not sufficient to avoid confusion when the brochure's cover prominently featured "Sun Life (U.S.)." PX 97. This dispute over SLC's potentially confusing use of "Sun Life (U.S.)" remained unresolved.

In December, 1982, SLC produced a draft settlement agreement based on the general understanding reached in the Washington meeting. *See* PX 100. The draft stated that both parties agreed not to use the phrase "Sun Life" standing alone on any piece of sales advertising without identifying in prominent fashion the party's full corporate name.

SLC forwarded the draft agreement to SLA, but Plaintiff failed to respond to the proposal and the 1982 draft agreement was never signed.

### D. *Hostilities Resume*

In 1984, Plaintiff SLA began another program to promote sales of annuities through consumer advertising and direct mail. This marketing operation was informally titled "Sun Financial Services" but also used several variations, including "Financial Services Division" and "Financial Services Division— Sun" in its activities. PX 23–35; 37–68; 71–72. Prior to April, 1987, Plaintiff used "Sun Financial Services" in a total of about seven advertisements and in all cases the term was used as a part of a return address. No evidence was introduced showing that consumers associate the "Sun Financial Services" name with Sun Life of America or that Plaintiff established market penetration under that name in any geographic area.[7] Between February, 1986, and March, 1987, SLA ceased all advertising use of "Sun Financial Services" pursuant to an agreement with a third party prior user of the name "Sun Financial Corp." DX 207, 208.

In April, 1986, SLC chose a new corporate title, "Sun Financial Group," for its U.S. operations. Sun Life of Canada registered the name "Sun Financial Group" with the United States Trademark and Patent Office without opposition in April, 1987. Prior to adopting

---

6. Rather than selling directly to individual investors, a wholesaler operates one level higher in the distribution chain, selling larger volumes of products to retailing brokerage firms for resale to the public.

7. The Court is not persuaded by Plaintiffs' claim that advertising the "Sun Financial Services" mark in national media generated more than ten thousand consumer responses and more than $6.5 million in premium revenue by January, 1986. *See* Plaintiffs' Proposed Post–Trial Findings of Fact and Conclusions of Law [# 177], ¶¶ 140–42. John O'Leary, President of a company he called "Sun Life (U.S.A.) Advertising" [a Sun Life of America affiliate], began a series of test advertising campaigns in September, 1984. This "direct response program" was designed to generate leads and sell annuities solely through advertising, without the customer seeing a company employee.

The accompanying exhibits are various informational advertisements urging consumers to

"Act Today!" to buy a single premium deferred annuity. The ads list a toll-free number to call and supply an attached mail-in coupon to get more information and an application. The issuer is identified only on a portion of the coupon's return address. The coupons instruct prospective customers to mail an inquiry to "Sun Financial Services," "Financial Services Division," or "Sun Financial Services Division." *See* PX 5–28.

Although counsel emphasized the name "Sun Financial Services" in direct examination, Mr. O'Leary's testimony shows that the results he claims from the numerous promotional campaigns cannot be associated with any single departmental name. Moreover, the most prominent mark on each coupon is the "S" logo, followed by "Sun Life," and in much smaller type, "Member of Sun Life Group of America." *See* Transcript, pp. 264–79, O'Leary testimony.

"Sun Financial Group," Defendants conducted a trademark search and sought the advice of outside counsel to assure that the mark was available for use and registration. Plaintiff's use of "Sun Financial Services" did not appear in the results of the search. Also, in 1982 and 1985, Defendants searched all 50 states for the mark "Sun Financial Services." Both searches revealed that unaffiliated third parties had registered the name in several states, including Georgia. Defendants concluded that "Sun Financial Services" was not available. *See* DX 662.

Sun Life of America's growth accelerated in 1986 through the acquisition of Anchor National Life Insurance Company and Anchor Financial Services, a registered broker-dealer. In 1989, SLA acquired another broker-dealer, Royal Alliance. These companies complemented SLA's product distribution strategy, enabling SLA to increase the sale of its annuities through broker-dealers. SLA also continued to sign new selling agreements with independent brokerage firms.

At the same time, SLC substantially increased its use of the "Sun Life (U.S.)" name in media advertising and promotional materials. *See* Transcript at 382–88, Derrickson testimony. Shortly thereafter, the dispute concerning SLC's use of "Sun Life (U.S.)" flared again. On March 18, 1988, Eli Broad, Chairman of Kaufman & Broad, wrote to SLC to complain about its use of "Sun Life (U.S.)" without the geographic modifier "of Canada." PX 105. Broad cited a specific example of actual confusion concerning an analyst's report on a "Sun Life U.S." annuity product. He also questioned SLC's recent registration and use of "Sun Financial Group." Broad insisted that "[c]ontinued expansion of financial services by each of the companies under marketing names which do not distinguish between the two companies will lead inevitably to serious public confusion." *Id.* SLC replied with a suggestion for holding discussions to resolve the conflict.

Company representatives met in September, 1988, but were unable to agree on a settlement. Plaintiffs subsequently filed this action on June 19, 1989.

During this period, Sun Life of America also sought a new name for its expanded financial services businesses. After extensive discussion, SLA settled on "SunAmerica Corporation," a name owned by Chemical Bank. In September, 1988, SLA purchased the rights to the "SunAmerica" name and in 1989 introduced "SunAmerica" as its umbrella mark. On August 30, 1993, SunAmerica Corporation merged into SunAmerica, Inc., a publicly-traded company. Plaintiff Sun Life Insurance Company of America is now a wholly-owned subsidiary of SunAmerica, Inc. Until very recently, SLA's commercial advertising emphasized its new identity as a financial services company by consistently using the corporate signature "Sun Life, a SunAmerica Company."[8] *See, e.g.,* DX 301.

Sun Life of America changed more than its name. In 1989, the company sold its life insurance business, retaining small amounts on its books but completely discontinuing industrial and ordinary life sales. SLA now issues only single premium deferred annuities.[9] However, testimony at trial indicated that Plaintiffs may soon offer a variable annuity product under the "Sun Life of America" name. *See* Transcript at 485, Greer testimony; Saltzman Deposition at 73–75. According to a senior sales manager at SLC's Massachusetts Financial Services, a new SLA variable annuity product would significantly increase the existing level of confusion: "If we have a product that is a direct competitor of ours with the name 'Sun Life' on it, there is going to be mass confusion in the marketplace." Transcript at 968, Grip testimony.

Moreover, SLA's broker-dealer subsidiaries sell the annuity products of both SLA and SLC. Since 1986, these SLA subsidiaries have sold at least $175 million of SLC's annu-

---

8. On cross examination, Jana Greer, SunAmerica's SVP of Corporate Communications, admitted that the name "Sun Life, a SunAmerica Company" was changed to "Sun Life of America, a SunAmerica Company" during trial. *See* Transcript at 483, 484, 491, and 509.

9. Plaintiffs' variable annuity product is distributed through its subsidiary, Anchor National Life.

ity products under the marks "Sun Life," "Sun Life (U.S.)" and "Sun Life Group." [10] The three brokerage subsidiaries continue to sell between $20 and $25 million per year of SLC's annuities. Plaintiffs have earned millions of dollars in commissions by selling Defendants' competing annuity products. In addition, SLA's subsidiaries distribute sales literature for both SLA and SLC, including those brochures and prospectuses containing the many variations of "Sun Life" names used by both parties. In particular, the allegedly offending name "Sun Life (U.S.)" was prominently featured in promotional material provided by SLC and distributed to annuity customers by SLA's subsidiary sales organizations.[11]

In 1990–91, the insurance industry was rocked by the so-called "junk bond scandal," a period when investors became concerned about the financial viability of certain insurance companies whose policyholders' money was invested in high-yield, high-risk securities. Under a new, broader definition of "junk bonds" adopted by state regulatory agencies, many life insurers began reporting increased holdings of non-investment grade securities. On April 30, 1991, the New York Times ran a front page story featuring warnings by some consumer groups that insurance companies investing in low grade bonds faced heavy losses. DX 636. In reporting the balances held by many large insurers, the newspaper shortened Sun Life of America's name to "Sun Life," causing concerned calls from the media and from customers directed to Sun Life of Canada.

Financial stability is critical to an annuity issuer. Such confusion as resulted from the junk bond episode can undermine public confidence in the financial strength of a company and impair its ability to market credit-sensitive products such as annuities. SLC has a superior credit rating in the insurance indus-

try, substantially higher than SLA's. Throughout its history, SLC has been given *Best's Insurance Reports'* highest rating, currently an "A++". SLA has an "A" rating, two categories lower, but still termed "excellent" by *Best's*. SLC's American subsidiary, Sun Life of Canada (U.S.), has the same A++ rating as Sun Life of Canada. *See* DX 914, 1993 tab; Transcript at 645–46, Lautzenheiser testimony.

## III. *THE JOINT SURVEY*

At the Court's direction, the parties conducted a survey to measure the level of confusion among registered brokers caused by the similarity in company names. The study was jointly designed and executed by Plaintiffs' expert, Norman Passman, and Defendants' expert, Jerry Wind. *See* PX 1002, DX 1000. Both experts testified at trial. *See* Transcript at 515–85, Passman testimony; at 587–627, Wind Testimony. Not surprisingly, the experts do not agree on the proper interpretation of the survey results, as further described below.

In this "mystery shopper" survey, trained interviewers telephoned pre-selected broker-dealers, pretending to be potential annuities buyers. The responding brokers were individual registered representatives segregated into three groups: (1) brokers licensed to sell SLA annuities; (2) brokers licensed to sell SLC annuities; and (3) brokers licensed to sell both SLA and SLC annuities. The survey purports to assess the degree to which brokers trained to sell SLA and SLC annuities are confused by the similarity in names into believing that there is some affiliation between the two companies.

Although the survey focused on registered representatives, the results indicate the degree of confusion existing among consumers. Registered representatives are the conduit through which most annuities reach consum-

---

**10.** The record is not clear as to whether these SLA companies have also sold an additional $140–175 million of Defendants' annuity products under the "Sun Financial Group" mark. *See* Transcript at 964–65, Grip testimony; Stoltz deposition at 70–82. Defendants' Exhibits 795–804 contain copies of sales agreements and detailed distribution reports showing that SLA subsidiaries Southmark Financial Services, Sun-

America Securities, and Royal Alliance sold substantial amounts of the SLC–MFS "Regatta" annuity product.

**11.** Although this Court's injunction was vacated, Sun Life of Canada has voluntarily continued to abide by its terms. Thus, the name "Sun Life (U.S.)" has not been used in promotional materials since May, 1992.

ers. By regulation, all of SLC's annuities must be sold to the public by registered brokers, and most of SLA's annuities also are sold through brokerage firms. Because registered representatives are professional brokers trained in the sale of sophisticated financial products, they are normally more difficult to confuse by similar marks. Thus, evidence of confusion on the part of knowledgeable dealers tends to prove confusion on the part of consumers. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.29[1]; 3 *McCarthy* § 32.47[3] at 32–200 (3d ed. 1992).

Responding brokers were categorized as "definitely confused" if they answered a series of interview questions in any way that indicated they thought SLA and SLC were connected. In addition, SLA's expert used the term "core level confusion" to distinguish those situations where a registered representative was asked about his own client and wrongly believed that there was a connection with the adverse party. For example, core confusion exists when an SLA broker is asked about "Sun Life of America" and responds in a way that shows the broker believes that Sun Life of America is connected with Sun Life of Canada. Also, core confusion describes an SLC broker who is asked about buying one of the Canadian products and associates it with the American plaintiff.

Both experts agreed that the following results constituted "definite confusion" among brokers:

A. *LIST A: Brokers Representing Sun Life of America.*

There is a core level of confusion among brokers who represent Sun Life of America averaging 25%. For example, when asked about the name "Sun Life Insurance Company of America," 19% of the SLA brokers thought the American company was connected with the Canadian insurance company. When asked about "Sun Life of America," 31% of the brokers selling SLA annuities were confused about a possible connection with the larger Canadian defendant.

Significantly greater confusion resulted when interviewers questioning SLA brokers asked about the Canadian companies. Twen-

ty-two percent of the brokers thought there was some affiliation between "Sun Life Assurance Company of Canada" and the American plaintiffs. The name "Sun Life of Canada" confused 35% of the SLA brokers. The most confusing name was "Sun Life (U.S.)," where 59% of the SLA brokers indicated they believed "Sun Life (U.S.)" was connected to Sun Life of America.

B. *LIST B: Brokers Representing Sun Life of Canada*

The so-called "core level" of confusion among Sun Life of Canada brokers is somewhat lower, averaging about 10%.

When interviewers asked SLC brokers about the Canadian company names, 6% of the sample group thought "Sun Life Assurance Company of Canada" was affiliated with SLA. Thirteen percent thought there was an American affiliation when asked about the name "Sun Life of Canada." A total of 9% of the SLC brokers were confused by the name "Sun Life (U.S.)."

When asked about the American company names, however, the percentage of SLC brokers classified as "definitely confused" is dramatically higher. Sixty-nine percent of the brokers thought "Sun Life Insurance Company of America" was connected with Sun Life of Canada. Fifty-seven percent of the SLC brokers confused the name "Sun Life of America" with Defendant.

C. *LIST C: Brokers Representing Both Companies*

This measure of "definite confusion" applies to brokers who represent both Sun Life of America and Sun Life of Canada. This is the group that has been trained in selling the products of each company and might therefore have the best basis for distinguishing the two names. Also, because these brokers are authorized to sell annuities for both companies, there is no dispute about interpreting data from some respondents labeled "possibly" and "probably" confused, a matter discussed below.

The following percentage of LIST C brokers wrongly perceived a connection between

the American and Canadian companies when questioned about the names:

"Sun Life Insurance Company of America" ...........................39%
"Sun Life of America" .................................................30%
"Sun Life Assurance Company of Canada" ...........................24%
"Sun Life of Canada" ...............................................6%
"Sun Life (U.S.)" ..................................................35%

### SUMMARY: "DEFINITELY CONFUSED"

| Stimuli | LIST A: SL Amer. Brokers | LIST B: SL Can. Brokers | LIST C: Brokers for Both Parties |
|---|---|---|---|
| Sun Life Ins. Co. of America | 19% | 69% | 39% |
| Sun Life of America | 31% | 57% | 30% |
| Sun Life Assur. Co. of Canada | 22% | 6% | 24% |
| Sun Life of Canada | 35% | 13% | 6% |
| Sun Life (U.S.) | 59% | 9% | 35% |

### D. *"Probably" and "Possibly" Confused*

The experts agree that the responses above show the percentage of brokers who are "definitely confused." They do not agree, however, on defining an additional group of "probably" and "possibly" confused brokers.

As the survey responses were analyzed for signs of "definite" confusion, a second category of respondents emerged—those who were labeled "possibly confused" by Plaintiffs and "probably confused" by Defendants.[12] SLA's expert later reclassified as "not confused" many respondents he had initially labeled as "possibly confused." *See* Transcript at 534–35, 537–39, 566–69, Passman testimony; at 590–92, 595–602, Wind testimony. The re-sult is that SLA's version of the survey data shows significantly fewer "confused" brokers in total. For example, of the LIST A brokers, those who represent Sun Life of America, Plaintiffs find only an additional 2% that were "possibly confused" by the name "Sun Life of Canada." On the other hand, Defendants contend that an additional 51% of the LIST A brokers were "probably confused" by the name "Sun Life of Canada."

The Court will not attempt to resolve the experts' disagreement on how many respondents were "possibly" or "probably" confused. The experts agree that many brokers were "definitely confused," indicating an absolute level of confusion that is very high. In addition, the Court is convinced that the

---

12. The "probably/possibly" controversy arose because the two experts who designed the survey apparently could not agree on the meaning of the brokers' responses to one of the questions. The survey called for an interviewer to ask: "Do you sell [*company name*] annuities?" A broker who represented Sun Life of America and answered "yes" when asked if he sold Sun Life of Canada, and vice versa, falls in this category.

Plaintiffs' expert minimized these responses as an indicator of confusion, initially terming the respondents "possibly confused." Mr. Passman speculated that the broker, although answering wrongly, may have thought it possible to quickly secure the necessary license with the issuing company in order to make the sale. Thus, Passman reasoned, the broker may not have been confused at all. *See* Transcript at 534–35, Passman testimony.

Conversely, Defendants' expert included these responses, calling the brokers "probably confused." His interpretation is supported by evidence showing: (1) other open-ended questions in the survey do not support Plaintiffs' assumptions, and (2) brokers are trained to have specific knowledge about the selling requirements for products they discuss with the public. *See* Transcript at 590–95, Wind testimony.

number of brokers in the definitely confused category should be further increased by an undetermined number to reflect the likelihood that among the disputed responses there is reliable evidence of additional confusion.

### E. The "Sun Life" Abbreviation

According to the experts, the joint survey does not determine the amount of confusion generated solely by the use of "Sun Life" in both companies' names. *See* Transcript at 545, Passman; at 606–07, Wind testimony.

The survey results show that brokers responding to the short-form name "Sun Life" are indeed confused. Eighteen percent of SLA's brokers believe the name "Sun Life" is Canadian, 37% think it is American, and 46% gave "ambiguous" answers. Not surprisingly, SLC brokers generally believe the "Sun Life" name is Canadian, with 57% indicating a Canadian affiliation and only 5% saying it is American. In addition, thirty-three percent of the SLC brokers gave ambiguous responses. Of the brokers representing both companies, 32% believe "Sun Life" is Canadian, 30% believe it's American, and 38% of the answers mentioned both options or gave no indication of the origin. Thus, according to the registered representatives who sell the products, the name "Sun Life" might be American or Canadian, neither or both.

### F. The Reasons For Confusion

The absolute level of confusion among brokers is astounding. Credible testimony at trial established that licensed brokers, as a group, are reasonably well-trained in the characteristics of annuity products. *See* Transcript at 592–94, Wind testimony. Since the credit risk associated with the issuer of an annuity is one of the fundamental concerns a broker or investor should address, how can a presumably knowledgeable sales agent confuse the origin of an annuity product?

These survey results are at least partially attributable to the rapid growth and escalating complexity of financial markets, coupled with the relatively recent changes in the traditional channels of distribution used by the insurance industry. In an effort to achieve the profitability provided through massive product placement, insurance companies have expanded the scope of their promotional activities from the now quaint concept of an agent selling policies in the home to a complex and sophisticated brokerage network.

Viewed in the context of the marketplace, the resulting name confusion makes sense. Plaintiffs and Defendants compete for high volume annuity sales in the same arena, selling to the same customers through the same channels of distribution. While SLA sells only fixed annuities at present, SLC sells both fixed and variable annuities, as well as a full range of traditional, mortality based life insurance products. Both parties' products are sold by many of the same brokerage firms, even by Plaintiffs' own subsidiaries. These independent sales agents distribute promotional materials using a variety of "Sun Life" names for both Sun Life of America and Sun Life of Canada. Both companies target upper and middle income customers of similar profiles. Both companies periodically make extensive media use of their "Sun Life" names. It is hardly surprising, then, that both companies' brokerage representatives are confused about a possible connection between the American and Canadian companies. On the other hand, such confusion would have been unlikely among the customers who bought traditional insurance products through the companies' former channels of distribution.

## IV. LIKELIHOOD OF CONFUSION

SLA claims that SLC's use of "Sun Life (U.S.)" and "Sun Life" without a geographic modifier creates a likelihood of confusion with "Sun Life of America." SLC contends that SLA's "Sun Life of America" name generates a likelihood of confusion with "Sun Life of Canada." In addition, Plaintiffs argue that Defendants' use of "Sun Financial Group" is confusingly similar to SunAmerica's "Sun Financial Services."[13]

---

13. This Court has previously determined that

there is an overwhelming likelihood of confusion

■ Liability under § 43(a) of the Lanham Act requires proof of the likelihood of confusion. 15 U.S.C. § 1125(a). Likelihood of confusion is a question of fact. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 839, 840 n. 16 (11th Cir.1983). This circuit has identified seven factors to consider in deciding whether a party's use of a contested mark is likely to cause confusion. *See Dieter v. B & H Indus.,* 880 F.2d 322, 326 (11th Cir.1989). In making its factual determination, the district court must evaluate the weight accorded to each subsidiary fact, rather than simply computing whether the majority of factors show a likelihood of confusion. *Jellibeans,* 716 F.2d at 840 n. 17. The seven factors are: (1) type of mark; (2) similarity of mark; (3) similarity of products; (4) similarity of distribution channels and customers; (5) similarity of advertising; (6) defendant's intent; and (7) proof of actual confusion. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1514 (11th Cir.1984).

### A. *Type of Mark*

■ The first factor measures the distinctiveness of the mark. Marks are often classified into four categories of distinctiveness, in decreasing degrees of strength. "Arbitrary" and "suggestive" marks are regarded as being inherently distinctive, while weaker "descriptive" and "generic" marks are nondistinctive. Inherently distinctive marks do not require proof of secondary meaning, while merely "descriptive" marks must have acquired distinctiveness through secondary meaning in order to be protected by the trademark laws. *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. —, —, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992). "Generic" words can never be trademarks. Unfortunately, "[t]he demarcation between each category is more blurred than it is definite." *Investacorp, Inc. v. Arabian Inv. Banking Corp.,* 931 F.2d 1519, 1522 (11th Cir.1991); *see generally* 1 *McCarthy* § 11.01.

■ Descriptive marks simply identify a characteristic or quality of a product. *Investacorp,* 931 F.2d at 1522. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected unless they acquire a secondary meaning. *American Television and Communications Corp. v. American Communications and Television, Inc.,* 810 F.2d 1546, 1548–49 (11th Cir.1987). The difference between descriptive and generic terms is merely a difference of degree. *Id.* Also, marks designating the geographic location of a business are considered descriptive and are not inherently distinctive. *Investacorp,* 931 F.2d at 1522–23 (contrasting descriptive and suggestive marks). *See generally* 1 *McCarthy* §§ 11.05–.09.

■ The service marks at issue here are composed of the words "Sun Life" along with various geographic modifiers. The "Life" component obviously describes life insurance products sold by a life insurance company. Although SLA at one point attempts to characterize "Sun" as an arbitrary term weakened by third-party usage, Plaintiffs' Supplement [# 184] at ¶ 5(a), the Court finds that the composite marks, viewed as a whole, are descriptive and cannot be protected unless secondary meaning is proven.

■ A merely descriptive mark may acquire distinctiveness, otherwise known as "secondary meaning." 15 U.S.C. § 1052(e), (f). Secondary meaning arises when consumers connect the mark and the provider of a product. *Investacorp,* 931 F.2d at 1525.

> "In order to establish secondary meaning the plaintiff must show that the primary significance of the term in the minds of the consumer public is not the product but the producer." If the corporate name denotes to the consumer or purchaser "a single thing coming from a single source," then it has acquired secondary meaning.

*American Television,* 810 F.2d at 1549 (citations omitted). The factors to consider in

---

between "Sun Life (U.S.)" and "Sun Life of America." *See* Order [# 137], June 7, 1991, at 12–14. At trial, the parties did not dispute this conclusion. Also, neither party contested the Court's previous determination that "Sun Financial Group" is likely to be confused with "Sun

Financial Services." *See id.* at 18–19. Instead, both parties rely on the existence of confusion to argue their respective legal conclusions. *See* Defendants' Proposed Conclusions of Law [# 178], ¶¶ 6, 68; Supplement to Plaintiffs' Proposed Conclusions of Law [# 184], ¶¶ 7, 20.

determining whether a user's mark has acquired secondary meaning include length of use, nature and extent of advertising, efforts made to promote a connection between the mark and the user, and the extent of actual public association of the two. *Investacorp,* 931 F.2d at 1525.

■ Among the many exhibits introduced at trial are numerous examples of promotional materials used by both companies over at least a seventy-five year period in an effort to associate their service marks with their products. Both SLA and SLC have sold billions of dollars of insurance and annuities under their respective "Sun Life" marks. Both companies claim to have established secondary meaning in their marks. Based on evidence of the parties' long period of service mark usage, their extensive advertising and sales, and their continued efforts to promote an association between their respective names and their products, the Court finds that both parties have established secondary meaning for their corporate names "Sun Life of America" and "Sun Life of Canada."

■ The Court also notes that Defendants' registered marks "Sun Life of Canada" plus design and "Sun Life of Canada," # 830,779 and # 1,164,060 respectively, are "incontestable," pursuant to § 15 of the Lanham Act, 15 U.S.C. § 1065. An incontestable mark is presumed valid, subject to certain enumerated defenses contained in Lanham Act § 33(b), 15 U.S.C. § 1115(b). Furthermore, an incontestable mark cannot be challenged on the grounds that it is merely descriptive and without secondary meaning. *See Park 'N Fly, Inc. v. Dollar Park and Fly,* 469 U.S. 189, 197–98, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985). This Circuit has held that incontestable status is one factor to consider in the likelihood of confusion analysis, but an incontestable mark "is presumed to be at least descriptive with secondary meaning." *Dieter,* 880 F.2d at 329.

### B. *Similarity of Marks*

To evaluate the similarity of marks, a district court must consider "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1531 (11th Cir.1985). As a general rule, "[w]here the goods and services are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." 2 *McCarthy* § 23.03 at 23–40 (citing cases).

The salient portion of the parties' disputed service marks is the term "Sun Life." Thereafter, the marks contain less important geographic modifiers which have little impact on a consumer's ability to distinguish a group of unassociated companies selling nearly identical products. The Court finds that Defendants' mark "Sun Life (U.S.)" is indistinguishable from Plaintiffs' "Sun Life of America." The Court further finds that the marks "Sun Life of America" and "Sun Life of Canada" are closely similar in sound, appearance, and overall commercial impression.

### C. *Similarity of Products*

The third factor to consider is the similarity between the products and services provided by the parties. As the Former Fifth Circuit noted, "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch.,* 628 F.2d 500, 505 (5th Cir.1980).

Here, both parties are insurance companies selling annuity plans. Although SLC also sells a broad range of insurance products and SLA presently sells only single premium deferred annuities, the parties' annuity products are very similar in a commercial sense. Even a sophisticated consumer could easily conclude that either company's annuity product originated with the other.

### D. *Similarity of Distribution Channels and Customers*

Dissimilarities in the means of distribution and a difference in the type of consumers that purchase the parties' products lessen the possibility of confusion. *Id.* In this case, the parties' distribution channels overlap significantly and their potential customer base is identical.

Despite differences in their products, distribution systems, and customers during the first half of this century, the business strategies of the litigants have converged. Today, SLA and SLC occupy virtually the same niche in the financial services market. As the Court has noted, the two companies are presently engaged in providing similar products and services through similar channels of distribution to similar customers. Both companies market annuities through broker-dealers, a distribution channel both established in the early 1970's. In many instances, they sell their competing products through the same registered firms and even through the same individual brokers. Moreover, both companies target the same upper and middle income consumers. In short, the distribution and customer aspects of the annuity business conducted by Plaintiffs and Defendants is virtually identical for trademark purposes.

### E. *Similarity of Advertising*

Evidence presented at trial shows great similarity between the parties' advertising materials. Obviously, similarities in advertising can exacerbate the likelihood of confusion.

In the past, both parties have advertised annuity products extensively through national magazines and newspapers. Although neither is currently involved in substantial mass media advertising, both make full use of promotional materials distributed by sales agents and brokers. In many cases, brokerage firms distribute brochures and other sales information for both Sun Life of America and Sun Life of Canada.

### F. *Defendant's Intent*

Although both litigants urge that the other intended to benefit from confusion caused by the similarities in their respective marks, the Court finds no credible evidence that either party adopted or used one of the disputed marks with the intent of deriving benefit from the reputation of the other. Without doubt, consumer confusion occasionally worked to one company's benefit and against the other. Neither party, however, presented persuasive evidence that the other engaged in a willful attempt to benefit from its competitor's goodwill.

### G. *Proof of Actual Confusion*

Actual consumer confusion is the best evidence of the likelihood of confusingly similar marks. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1543 (11th Cir.1986). Although there is no scale by which to balance the weight of actual confusion against the other factors, cases in this circuit indicate that evidence of actual confusion weighs most heavily in the finding. *See, e.g., Dieter*, 880 F.2d at 326; *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1529 (11th Cir.1985).

Evidence presented at trial showed conclusively that actual confusion between the various "Sun Life" marks is a common occurrence. Confused customers regularly call the wrong company for annuity information, or mail checks and applications to the wrong address several times each week. Poorly identified "Sun Life" advertisements create buyer interest in the competing company's product. A customer consents to a sales appointment, confusing the calling company's identity with its competitor. Confusion exists when salespeople fail to attend a seminar because they misidentify the issuer of the product; when newspapers confuse the names of the parties in reporting financial events; and when registered brokers routinely must be told which company a product manager does *not* represent.

Consistent with the abundance of anecdotal evidence, the parties' joint survey reveals a remarkable amount of actual confusion among those professional salespeople most likely to understand important product and issuer distinctions. Both parties agree that 57% of SLC brokers are definitely confused by the name "Sun Life of America," 59% of SLA brokers are confused by "Sun Life (U.S.)," and 35% of SLA brokers are confused by "Sun Life of Canada." Having examined the totality of the circumstances surrounding the time and type of trademark usage, the Court finds overwhelming evidence that actual confusion exists among the disputed "Sun Life" marks. *See Jellibeans*, 716 F.2d at 844.

Thus, with the exception of the intent factor, all subsidiary facts indicate a powerful likelihood of confusion among the various "Sun Life" marks. Weighing the evidence of 'actual confusion most heavily, the Court concludes that the parties' "Sun Life" marks are highly similar and that there is a substantial likelihood of confusion even when the companies' full names are used.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter of the complaint and counterclaim under 15 U.S.C. § 1121, 28 U.S.C. § 1338, 28 U.S.C. § 1331, and the Court's supplemental jurisdiction. Venue is proper under 28 U.S.C. § 1391(b). Personal jurisdiction is not contested.

## V. DEFENDANTS' COUNTERCLAIM

SLA's principal claim is based on section 43(a) of the Lanham Act, which provides liability for any organization using a trade name that is likely to cause confusion as to the origin of its products, or that misrepresents the origin of its products. *See* 15 U.S.C. § 1125(a). SLC counterclaimed as a prior user, acknowledging an intolerable level of confusion and challenging Plaintiffs' trademark rights in the name "Sun Life of America."

■ To merit injunctive relief under section 43(a), a claimant must establish:

(1) trademark rights in the disputed mark; and

(2) that defendant adopted the same or a confusingly similar mark, thereby creating a likelihood of confusion for consumers as to the true origin of the goods.

*Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984). Thus, to prevail on its counterclaim, Sun Life of Canada must first establish a prima facie case by showing that it has enforceable rights in its name, and that Plaintiffs' use of "Sun Life of America" creates a likelihood of confusion.

### (1) Trademark Rights

■ The Court finds that Sun Life of Canada is the senior user of the "Sun Life" marks, having continuously used "Sun Life of Canada" in the United States since 1895 and the "Sun Life" abbreviation at least since 1914. In addition, its commercial success after entering the United States indicates that SLC achieved secondary meaning in the "Sun Life of Canada" and "Sun Life" marks prior to Plaintiffs' adoption of its "Sun Life Insurance Company of America" name in 1916. Accordingly, Defendants have a protectable property interest in their "Sun Life" marks.[14] *See Investacorp,* 931 F.2d at 1522 (if a mark is not inherently distinctive, a company obtains rights when the mark attains secondary meaning). *See also* 1 *McCarthy* § 16.12.

### (2) Likelihood of Confusion

As discussed above, the Court finds that a likelihood of confusion exists between the names "Sun Life of America" and "Sun Life of Canada."

## VI. PLAINTIFFS' ACQUIESCENCE DEFENSE

In response to Defendants' Lanham Act claim, SLA asserts the affirmative defense of acquiescence. In essence, Sun Life of America argues that SLC knew of and affirmatively consented to SLA's use of the "Sun Life of America" and "Sun Life Insurance Company of America" service marks. The Court agrees.

■ "Acquiescence" is an equitable defense denoting active consent by the trademark owner to another's use of the mark.[15]

---

**14.** As previously noted, Defendants' "Sun Life of Canada" mark was registered in 1967 and is incontestable, pursuant to the provisions of 15 U.S.C. § 1065 and subject to the defenses enumerated in § 1115(b).

**15.** Discussing the semantic confusion between "acquiescence" and "laches," *McCarthy* observes: "To preserve some semantic sanity in the law, it is appropriate to reserve the word 'acquiescence' for use only in those cases where the trademark owner, by affirmative word or deed, conveys its implied consent to another. That is, laches denotes a merely passive consent, while acquiescence implies active consent."

3 *McCarthy* § 31.14[1].

**1578**

If acquiescence is proven, the trademark owner is estopped from asserting dormant rights against an infringer. *See Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.,* 934 F.2d 1551, 1558 (11th Cir.1991). The acquiescence defense requires proof of three elements:

(1) that the owner actively represented it would not assert a right or claim;

(2) that the delay between the representation and the assertion of the right or claim was not excusable; and

(3) that the delay caused the alleged infringer undue prejudice.

*Id.* In this case, the facts show that Sun Life of Canada acquiesced to Plaintiffs' use of the allegedly infringing marks.

### (1) *Affirmative Representations*

Evidence produced at trial establishes that SLC affirmatively consented to SLA's use of "Sun Life of America" through at least 1980. Nor do Defendants contest this first element of acquiescence. *See* Defendants' Proposed Conclusions of Law [# 178], ¶ 12; Defendants' Proposed Findings of Fact [# 178], ¶ 63.

In 1916, Sun Life of Canada protested Sun Life of America's name change, recommended that the parties endeavor to avoid confusion, and wished the American company "a full measure of success." During the 1950's and 1960's, SLC assisted in Plaintiff's expansion by consenting to SLA's entry into various states. In 1973, Defendant wrote to complain about frequent reports of confusion caused by the similarity in names and emphasized the importance of including the words "of America" in Plaintiff's printed materials. The 1980 Settlement Agreement expressly noted the "long and continuous use" of each party's service marks in commerce, promising that if SLA "adopts Sun Life Group of America as its corporate name and/or service mark, Sun Life Canada consents to such use." The proposed settlement agreement drafted by Sun Life of Canada in 1982, although never signed, indicates that SLC still intended to use geographic modifiers to resolve "confusion in the marketplace" arising from both parties' use of "Sun Life."

Thus, Sun Life of Canada represented over a period of more than sixty years that it would not assert a claim against Plaintiffs' use of the "Sun Life" mark. The Court concludes that Sun Life of Canada actively consented to and assisted Sun Life of America in establishing goodwill and commercial value in the "Sun Life of America" name.

### (2) *Inexcusable Delay*

Sun Life of Canada claims that the delay in asserting its trademark rights until 1989 is excusable because it was not until the late 1980's that the parties first sold the same products through the same channels of distribution to the same kinds of customers. This claim simply does not comport with the evidence adduced at trial.

First, the parties need not be in direct competition, nor must their products be identical, to support a finding of infringement by a junior user. *See Forum Corp. of North America v. Forum, Ltd.,* 903 F.2d 434, 442 (11th Cir.1990). Confusion, or the likelihood of confusion, is the real test. *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857, 861 (5th Cir.1967).

Second, the evidence shows that the parties were competitors in several respects for many years and were engaged in selling the same products through the same channels to the same customers at least by the mid-1970's. Beginning in 1916, SLC repeatedly pointed out the real danger of public confusion in its communications with SLA. At first, SLC's concerns were based on no more than the fact that both companies sold insurance in the United States. Over time, as the parties' products and sales strategies evolved, Sun Life of Canada became even more concerned, threatening to resort to litigation as early as 1979.

Ordinary life insurance has long been the principal source of revenue for Sun Life of Canada. SLA sold ordinary life insurance in small amounts through general agents in the 1920's, increasing its emphasis on the product in 1952 by creating a general agency division. By 1963, the majority of its premium income came from the sale of ordinary

life insurance, and by 1973 ordinary life premiums represented 75% of its business.

Both companies have sold annuities for many years, as well. Sun Life of Canada had established its annuity business before 1915. Sun Life of America was selling annuities by the 1920's. In 1973, SLA began selling single premium deferred annuities through independent broker-dealers at the same time that SLC began selling variable annuities through its wholly-owned broker-dealer subsidiary SUNESCO. Frequent reports of public confusion in 1973 prompted SLC's Director of Public Relations to complain about SLA's advertising, cautioning: "I think we have to expect that there will always be some degree of confusion over identification." When SLC acquired Massachusetts Financial Services in 1982, SLA was already established in the broker-dealer market. The facts show that Sun Life of Canada fully appreciated the danger of confusion in 1980 and 1982 when it negotiated two agreements intended to resolve the escalating tensions by appending geographic modifiers to the various "Sun Life" names.

While it is true that the senior user of a mark has no obligation to sue until "the likelihood of [public] confusion looms large," Defendants' Proposed Conclusions of Law [# 178], ¶ 13 (quoting 3 *McCarthy* § 31.06[2][a]), Sun Life of Canada recognized early and complained frequently about the increasing levels of public confusion caused by the similarity in names. The Court concludes from the evidence that Sun Life of Canada's delay in asserting its trademark rights through a counterclaim filed in 1989 is not excusable.

### (3) *Undue Prejudice*

The third element of the acquiescence defense requires proof that Sun Life of America would suffer undue prejudice from Defendants' inexcusable delay in filing suit. Although this element presents a close question at this point in time, the Court is persuaded that SLA would lose some material amount of goodwill in its "Sun Life" name if it is forced to cease using the mark.

Unquestionably, SLA built considerable goodwill during the long period of SLC's affirmative consent to its expansion. However, Sun Life of America became known to consumers primarily as an insurance company and SLA no longer sells insurance. In addition, the Court recognizes that since 1989 Plaintiffs have widely used the "SunAmerica" name in marketing their annuity products.

On the other hand, SLA's goodwill was not based on life insurance alone, nor was all of its goodwill surrendered when the company exited the insurance business. Trial testimony established that single premium deferred annuities have long been a part of SLA's product base. As a consequence, annuity sales through the years also contributed to the accumulation of goodwill. Even though the company may have sold its life insurance portfolio, it retained and expanded its annuity business, continuing to build on the goodwill previously established. Moreover, the trust and confidence consumers developed in the company's insurance products likely carried over into its annuity sales.

On balance, the Court finds that SLA retains a quantum of goodwill attributable to its long history of insurance and annuity sales under the "Sun Life of America" mark. Accordingly, the company will suffer undue prejudice from a change in name.

### VII. *INEVITABLE CONFUSION*

█ The Court has determined that Defendants have protectable property rights in their "Sun Life" marks; that Plaintiffs' use of similar marks presents a likelihood of confusion; and that Defendants have acquiesced in Plaintiffs' use of the confusingly similar marks. As earlier noted, acquiescence will estop Sun Life of Canada from extinguishing Sun Life of America's use of its mark unless there is an inevitability of confusion. *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 24 U.S.P.Q.2d 1505, 1510, 974 F.2d 1348 (11th Cir.1992). The Eleventh Circuit recently explained:

Although petitioner has acquiesced in use of their logo by the registrant, the public interest in preventing confusion around the marketplace is paramount to any inequity caused the registrant. Consequently, if there is an inevitability of

confusion, petitioner's law suit may be revived from estoppel.

*Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1564 (11th Cir.1991) (citing *Iodent Chem. Co. v. Dart Drug Corp.*, 207 U.S.P.Q. 602 (T.T.A.B. 1980)). Thus, even if a junior user establishes the equitable defense of acquiescence, the prior user will not be estopped to assert trademark rights "if the identity of the marks and goods of the parties are such that confusion or mistake in trade is inevitable." *Iodent*, 207 U.S.P.Q. at 606.

▪ The standard for finding an inevitability of confusion is "an increment higher" than the standard for finding a likelihood of confusion. *Coach House*, 934 F.2d at 1564. In the present case, that additional increment is easily satisfied by the abundance of evidence provided by witnesses and by the proof of actual confusion found in the results of the joint survey.

Although by no means the only proof of confusion, the survey results provide a quantitative assessment of a "definitely confused" market even when the companies' full names are used. Courts have been willing to tolerate low levels of consumer confusion, but levels falling within the 25% to 50% range are viewed as excessive. *See generally* 3 McCarthy § 32.54[1][c] (citing cases). In this case, definite confusion ranged from 15% to 35% on average among brokers representing both companies, exceeded 60% among SLC's brokers asked about the American company, and averaged between 28% and 59% of SLA's registered representatives questioned about the Canadian entities. Moreover, the survey's measure of definite confusion understates the true amount of broker confusion, since it excludes those respondents who were "probably" and "possibly" confused.

In a more qualitative sense, the Court is acutely aware that annuity investments are often of critical importance to the people who make them, representing as they do the expectations of a secure retirement income derived from the proceeds of one's life savings.[16] Consequently, the fact that even 15% to 20% of those making such an investment decision are definitely confused about the identity of the issuer is far less tolerable than if the same consumer were buying a household cleanser or a restaurant meal.

In light of these considerations, the Court concludes that the undisputed levels of definite confusion proven by the joint survey, together with other evidence of actual confusion as described above, establish inevitability of confusion even when the litigants use their full company names. Consequently, geographic modifiers will not cure the problem. Given the close similarity in service marks and the virtual identity of the parties' products, channels of trade, customer base, and advertising media, the public interest becomes the Court's dominant consideration. *See The Ultra–White Co. v. Johnson Chem. Indus., Inc.*, 465 F.2d 891, 893–94 (C.C.P.A. 1972). In this instance, the public interest in preventing intolerable confusion in the marketplace requires the revival of Defendants' prior trademark rights. Accordingly, Defendants are entitled to an injunction barring Plaintiffs' continued use of a "Sun Life" mark.

## VIII. *"SUN FINANCIAL GROUP" and "SUN FINANCIAL SERVICES"*

Plaintiffs contend that Defendants' use of "Sun Financial Group" is confusingly similar to SunAmerica's "Sun Financial Services." Plaintiffs assert two claims for cancellation against Defendants' federal registration of "Sun Financial Group," issued by the Patent and Trademark Office on April 21, 1987. First, SLA seeks cancellation pursuant to § 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), on the ground that SLA's prior use established protectable rights in the similar name "Sun Financial Services." Plaintiffs base a second cancellation claim on sec-

---

**16.** John O'Leary, Sun Life of America's advertising chief, described the customers targeted by his direct response program:

[P]ersons with accumulated wealth, and by definition that would be people over the age of 50, generally, many even over the age of 60 that have accumulated wealth and are looking for ways to enhance their savings of that wealth and to enhance their investment opportunities and to gain the advantages of tax deferral.

Transcript, p. 264, O'Leary testimony.

tion 14(3) of the Lanham Act, 15 U.S.C. § 1064(3), contending that SLC's mark is being used to misrepresent the source of its products. Alternatively, SLA seeks to require SLC to use the geographic modifier "of Canada" with its "Sun Financial Group" mark.

As noted, neither party contests the Court's previous determination that "the undisputed material facts indicate a likelihood of confusion between 'Sun Financial Group' and 'Sun Financial Services.'" Order, June 7, 1991, at 18–19. Therefore, the Court will not re-examine the seven likelihood of confusion factors discussed at length above, but simply reiterate its factual finding that the two descriptive marks are likely to cause confusion.

■■■ To cancel Defendants' registration under section 2(d) of the Lanham Act, Plaintiffs must show:

(1) that the registered mark resembles Plaintiffs' mark;

(2) that Plaintiffs acquired trade identity rights in the mark before Defendants used the mark; and

(3) that the registered mark is likely to cause confusion.

*Coach House,* 934 F.2d at 1559; *see also Tally–Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1025–26 (11th Cir.1989) (discussing infringement of a common law mark).

■■■ Although Plaintiffs are the senior users of the "Sun Financial Services" mark, the second element requires that they must have obtained protectable trade rights in the mark prior to SLC's first use of "Sun Financial Group" in April, 1986. Because the service marks at issue here are no more than descriptive marks, this means that the name "Sun Financial Services" must have acquired secondary meaning before Defendants' usage began. *See Coach House,* 934 F.2d at 1560; *see also Towers v. Advent Software, Inc.,* 913 F.2d 942, 945–46 (Fed.Cir.1990) (petitioner for cancellation of a federally registered trademark must show that his unregistered and previously used term had acquired secondary meaning so as to create trade identity rights).

The evidence in this case does not support SLA's claim that "Sun Financial Services" gained secondary meaning by April, 1986. Indeed, "Sun Financial Services" was used sparingly prior to Defendants use and registration of "Sun Financial Group." SLA's infrequent use of the name as a return address on coupons and postcards was not sufficient to create an association between the term and Plaintiffs' products in the minds of consumers. "Sun Financial Services" was never more than the informal name of a marketing division, and was used interchangeably with other generic identifiers such as "Financial Services Division." Consequently, Plaintiffs have no protectable rights in "Sun Financial Services" sufficient to support cancellation of Defendants' federal registration under Lanham Act § 2(d).

■■■ To prevail on their § 14(3) claim, Plaintiffs must show that Defendants engaged in a "deliberate and blatant misrepresentation of source wherein the registration is merely a vehicle for the misuse rather than evidence of even a colorable ownership claim." *Global Maschinen GmbH v. Global Banking Sys., Inc.,* 227 U.S.P.Q. 862, 863 n. 3, (T.T.A.B.1985). In other words, this cancellation statute requires proof of a "blatant, aggressive misuse of a registered mark … in order to trade upon the renown and reputation" of the party seeking cancellation. *McDonnell Douglas Corp. v. National Data Corp.,* 228 U.S.P.Q. 45, 46 (T.T.A.B.1985); *see also* 2 *McCarthy* § 20.15[6] (a cancellation claim under § 14(3) "requires a pleading that registrant deliberately sought to pass off its goods as those of petitioner. Willful use of a confusingly similar mark is not sufficient.").

Plaintiffs here offered no such proof. There is no evidence that Sun Life of Canada desires to pass off its products as those of Sun Life of America. Nor is there evidence to support a charge that SLC has attempted to trade on the strength of the American company's reputation. Plaintiffs do not dispute that SLC enjoys an excellent reputation of its own. Financial data shows that the Canadian company is the larger and more profitable of the two and is rated in the top

2% of insurance companies by *Best's Insurance Reports.* In short, the contention that Sun Life of Canada would deliberately confuse the source of its products in order to trade on the reputation of Sun Life of America is implausible.

The Court concludes that Plaintiffs have failed to prove essential elements of their cancellation claims under sections 2(d) and 14(3) of the Lanham Act. Accordingly, Plaintiffs' claim for cancellation or modification of Sun Life of Canada's federal registration of "Sun Financial Group" must be denied.

## IX. *MISCELLANEOUS MATTERS*

### A. *Defendants' Other "Sun" Marks*

Plaintiffs also seek cancellation, under section 14(3), of eleven registered "Sun" marks owned by Sun Life of Canada. Plaintiffs charge that SLC used these marks to misrepresent the source of its products and that SLC abandoned the registrations. Alternatively, SLA wants the Court to order SLC to use a geographic identifier with the registered marks.[17]

Plaintiffs offered no evidence that these marks were used in an attempt to misrepresent Sun Life of Canada products as those originating with Sun Life of America. Also, the Court finds no proof that any of the eleven marks have been abandoned. Accordingly, SLA's claim for cancellation of SLC's federally registered marks is denied.

### B. *Plaintiffs' State Law Claims*

Plaintiffs' Counts VI, VII, and VIII seek relief under various state and common law theories, including O.C.G.A. §§ 23–2–55, 10–1–370, and 10–1–422, for unfair competition, deceptive trade practices, and false advertising. Plaintiffs maintain that "[t]he standards pertinent to these claims mirror those applied under section 43(a) of the Lanham Act." Supplement to Plaintiffs' Proposed Conclusions of Law [# 184], at 16; *accord Jellibeans,* 716 F.2d at 839, 846; *University of Georgia Athletic Ass'n v. Laite,* 756 F.2d

1535, 1539 n. 11 (11th Cir.1985). Having concluded that SLA cannot prevail on its Lanham Act claims, the Court rejects SLA's state and common law claims as well.

### C. *The "SunAmerica" Counterclaim*

In Count V, Sun Life of Canada challenges Sun Life of America's rights to and registration of the "SunAmerica" mark, contending that SLA's predecessor-in-interest abandoned its use of the mark before assigning it to Sun Life of America.

■ Proof of abandonment requires proof of the owner's nonuse and intent not to resume use. *See Investacorp,* 931 F.2d at 1525; *Remy Martin,* 756 F.2d at 1532 & n. 28. SLC failed to present evidence sufficient to establish an abandonment claim based on the conduct of the previous user of "Sun America."

### D. *Attorney's Fees*

■ A district court may award attorneys' fees to the prevailing party "in exceptional cases." 15 U.S.C. § 1117. Exceptional cases are those that involve "acts which the courts have characterized as malicious, fraudulent, deliberate, and willful." *Jellibeans,* 716 F.2d at 846 (citation omitted). Even if the court finds that the circumstances are exceptional, the decision to award fees is still discretionary. *Dieter,* 880 F.2d at 329.

■ Neither party is entitled to attorneys' fees in this case. The long history of product, market, and organizational changes that forms an integral part of the "Sun Life" saga demonstrates that each party had ample reason for continuing to use its traditional name. The evidence suggests no trace of conduct sufficiently bad to justify the imposition of statutory attorneys' fees.

## X. *CONCLUSION*

The Court has determined that Defendants established protectable rights in the "Sun Life of Canada" and "Sun Life" marks prior

---

**17.** The eleven marks are: "Sun Ultraterm," "Sun Execumaster," "Sun Interestmaster-Q," "Sun Interestmaster," "Sun Pensionmaster," "SunPlan 2," "Sun Lifemaster," "Sunplan," "Sun Fund," "Sun Fund" and design, and "Follow the Sun For Life."

to Plaintiffs' first use of the mark "Sun Life of America" in 1916. By subsequently approving and encouraging its competitor's expansion, Sun Life of Canada acquiesced in Plaintiffs' use of a confusingly similar mark, "Sun Life of America." Today, anecdotal and survey evidence convincingly shows that consumer confusion between the various full-name "Sun Life" marks is inevitable. Therefore, the Court **ORDERS** that Plaintiffs are hereby **ENJOINED** from further use of any "Sun Life" mark, as well as from further use of "Sun Financial Services."

**SO ORDERED.**

### ORDER OF THE COURT

This trademark action is before the Court on Plaintiff's Motions to Alter or Amend Judgment [# 187–1], for Stay Pending Appeal [# 187–2], and for New Trial [# 188–1]; and Defendant's Motions for Leave to File a Further Response [# 193–1] and Emergency Motion to Vacate Stay [# 204–1]. As an initial matter, Defendant's Motion for Leave to File an additional response [# 193] is unopposed, Local Rule 220–1(b), and is **GRANTED** for good cause shown.

### I. BACKGROUND

The case was before the Court for a non-jury trial during November and December, 1993. The Court determined that Defendants established protectable rights in the "Sun Life of Canada" and "Sun Life" marks prior to Plaintiffs' first use of the mark "Sun Life of America". While Sun Life of Canada subsequently acquiesced in Plaintiffs' use of a confusingly similar mark, evidence demonstrated an inevitable confusion between the two "Sun Life" marks. Thus, in August of 1994, Plaintiff was enjoined from further use of the "Sun Life" or "Sun Financial Services" marks.

Subsequently, Plaintiff's Motion for Stay of Judgment was granted pending this Court's decision on the Motion for Stay Pending Appeal to allow the parties time to address the relative merits of a further stay. An evidentiary hearing was held in March, 1995, regarding continuing the stay pending appeal.

### II. MOTIONS FOR NEW TRIAL/ALTER JUDGMENT

Plaintiff moves to alter or amend judgment under Fed.R.Civ.P. 59 and 60, based on inability to immediately conform to the injunction issued in August of 1994. This motion was, in effect, granted by the issuance of the temporary stay of judgment in September 1994. This Motion is **DENIED AS MOOT.**

Plaintiff also moves for a new trial based on its contention that the Court erred in its application of the law. Plaintiff first alleges that the Court misapplied the "inevitability of confusion" doctrine to invalidate Plaintiff's equitable defense of acquiescence. Plaintiff also asserts that some of the cases relied upon in an opinion cited by the Court are inapplicable to the instant case. Finally, Plaintiff claims that problem of intolerable confusion was created by Defendant and that the confusion can be reduced by means other than ceasing to use a mark.

A motion for new trial is governed by Fed.R.Civ.P. 59(a). Grounds for granting a new trial in an action tried without a jury are manifest errors of law, manifest errors of fact, and newly discovered evidence. *In re Devault Mfg. Co.*, 4 B.R. 382 (Bkrtcy.Pa.1980), aff'd 14 B.R. 536 (D.C.Pa. 1980). If the motion is based on a legal error, the error of law must prejudice a party's substantial rights to warrant a new trial. *See Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir.1989); *Diane Mfg. Co. v. Sheffield Indus. Inc.*, 514 F.Supp. 185, 186 (S.D.Fla.1981), aff'd, 685 F.2d 1387 (11th Cir. 1982).

The Court has carefully reviewed Plaintiff's arguments and finds them without merit. Plaintiff's Motion has failed to cite any legal error which would change the Court's prior determination as to the inevitability of confusion doctrine. *See, e.g., Coach House Restaurant v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1564 (11th Cir.1991); *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 24 U.S.P.Q.2d 1505, 1510, 974 F.2d 1348 (11th Cir.1992) (unreported in F.2d) (Birch, J., concurring). The Court is not persuaded by Plaintiff's argument that a

case cited by the Court is inapplicable in the instant case. Moreover, even were the attempted distinction meritorious, it would not warrant a new trial.

Finally, Plaintiff failed to establish at trial or post trial that its factual contentions are supported by the evidence. Defendant has shown that confusion is inevitable, even if both companies continue to use the names "Sun Life of America" and "Sun Life of Canada". (Order of August 22, 1994, p. 47). Consistent use of geographic modifiers are not sufficient to prevent the high levels of confusion. Contrary to Plaintiff's assertions, Defendants did not cause the present confusion by entering channels of trade in which Plaintiff had prior rights. In fact, Defendants were selling fixed annuities through broker dealers prior to Plaintiff. (*See id.,* pp. 9–10). The broker-dealer channel of distribution cannot be convincingly subdivided into independent and non-independent broker dealers, as Plaintiff argues.

Furthermore, Defendants have not used the name "Sun Life (U.S.)," which precipitated Plaintiff's suit, since May, 1992. Nevertheless, the 1993 survey indicated that the broker dealers who advise the public and sell annuities to the public cannot distinguish between Sun Life of Canada and Sun Life of America. (*Id.,* at 21–29). Therefore, Plaintiffs have not shown that the present confusion is the result of Defendant's actions. Thus, Plaintiff's motion is **DENIED**.

## III: STAY PENDING APPEAL/EMERGENCY MOTION TO VACATE STAY

Plaintiff seeks a stay pending appeal of this Court's injunction against further use of the marks "Sun Life" and "Sun Financial Services."

■ Under Fed.R.Civ.P. 62(c), a court may stay an injunction pending appeal. Considerations governing a stay pending appeal are similar to those for an injunction. Movant must show a likelihood of success on the merits, irreparable injury if relief is not afforded, no substantial harm to other interested parties, and no harm to the public interest. *In re Grand Jury Proceedings,* 689 F.2d 1351, 1353 (11th Cir.1982) (per curiam). If the other three factors weigh heavily in favor of a stay, the movant need only show a "substantial case" on the merits of a serious legal question. *Ruiz v. Estelle,* 650 F.2d 555, 565–66 (5th Cir.1981) (per curiam), cert. denied 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

### Success/Substantial Question on the Merits

Upon review of the record and this Court's previous findings, the Court concludes that there is no substantial question on the merits, due to the astounding level of confusion and the public interest in minimal confusion. (*See* Order of August 22, 1994).

### Irreparable Injury

■ Plaintiff has not established that it will suffer irreparable injury. Based upon the evidence presented, the Court finds that a name change would not be irrevocable and that Plaintiff could reverse the process should Plaintiff succeed on appeal. (*See* McCartney Affidavit); Ariz.Rev.Stat.Ann. § 20–218 (1994). Some expense and inconvenience will be involved in changing the name. However, Plaintiff has failed to show irreparable harm by the cost alone of the change. Expense alone, even if substantial, does not demonstrate irreparable harm. *See Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1994). The expense alleged by Plaintiff to make the change is not great when compared to the volume of Plaintiff's business.

Further, no legal or financial obstacle exists to Plaintiff ceasing to sell annuities under the Sun Life of America name. Plaintiff has been adept at creating new companies to sell financial products and in changing the business of existing companies in order to adapt to changing situations.[1]

Plaintiff moved into the fixed annuities market from a company which originally sold only industrial and later traditional life insur-

---

1. For example, Plaintiff recently created Sun-America National Life Insurance Company. (*See* Defendant's Emergency Motion).

ance. Sun Life of America no longer sells traditional life insurance but sells only fixed annuities through an entirely different channel of trade and to an entirely different market. Therefore, the good will inherent in the name as presently used by Plaintiff is limited. In addition, the Court finds that the options suggested by Defendants, such as private labelling or coinsurance under Anchor National, are viable. (*See* Transcript of March 1995 Hearing). However, the Court will allow Plaintiff to determine the manner in which it complies with the Court's injunction.

Finally, Plaintiff's increased identification with the name "SunAmerica" (*See* Plaintiff's Response to Emergency Motion, Exhibits A & B) diminishes the damage it will receive. Plaintiff's new marketing campaign, the first it has directed at the public, uses the name and sundial logo of SunAmerica prominently. (*Id.*) Accordingly, Plaintiff has failed to demonstrate that the harm from changing the "Sun Life" mark is irreparable.

### Harm to the Public Interest

 An important factor to be considered is the public interest in granting a stay. The public interest in minimal confusion is great. The 1993 survey conducted to measure the level of confusion among registered brokers found an absolute level of confusion that is astounding. (Order of August 22, 1994, pp. 21–29). Licensed brokers, as a group, are reasonably well-trained in the characteristics of annuity products. Moreover, the survey's measure of definite confusion understates the true amount of broker confusion, since it excludes those respondents who were "probably" and "possibly" confused. The results of the survey were consistent with an abundance of anecdotal evidence indicating confusion. (*Id.*)

The high level of confusion is the more serious because of the product involved. Members of the public must make decisions which affect their financial futures and involve billions of dollars of their savings. They rely on these investments to provide security for retirement. The differing finan-

cial security ratings of the two companies[2] suggest that investors may seek the more stable company for their investments. Thus, excessive confusion in the marketplace can result in investors choosing a certain product because they misunderstand its origin.

Such confusion is exacerbated by other factors. Both parties' products are sold by many of the same brokerage firms, even by Plaintiffs' own subsidiaries. Both companies target upper and middle income customers of similar profiles. The Court also found that the marks "Sun Life of America" and "Sun Life of Canada" are closely similar in sound, appearance, and overall commercial impression. Regardless of the Court's finding with the other factors to be considered in granting a stay, the public interest demands that Plaintiff market its securities in a manner that will indicate to the public the true origin of the securities.

### The Injunction

Accordingly, based upon this finding of intolerable confusion, the Court entered the injunction at issue on August 22, 1994. The injunction was stayed shortly thereafter to allow Plaintiff an opportunity to mitigate the effect of the Court's Order. At the March hearing, the Court unequivocally advised Plaintiff that any future marketing of fixed annuities would not be allowed under the name "Sun Life of America" because of the real danger of confusion to the public. However, Plaintiff failed to propose an Order that would comply with the Court's instructions.

In that regard, the Court is concerned by Plaintiff's recent launching of a large consumer marketing campaign, which uses the marks "Sun Life" and "Sun Life of America", albeit in conjunction with the SunAmerica name. (*See* Defendants' Emergency Motion, Exhibit C; Plaintiff's Response, Exhibit A; Defendant's Reply, Exhibits B & C). Plaintiff's actions violate the Court's specific instructions from the March 1995 hearing. Plaintiff's aggressive continued use of the "Sun Life" name while this Motion is pending takes advantage of the Court's attempt to

---

**2.** Sun Life of Canada is rated higher by both Best's and Standard and Poors. (Transcript of March 1995 Hearing; Order of August 22, 1994, p. 21).

accommodate Plaintiff pending its appeal. Moreover, Plaintiff apparently cannot prevent the use of "Sun Life" without the geographic modifier, even by its own employees. (*See* Defendant's Exhibit C; Plaintiff's Response, pp. 3–4; *see also* Order of August 22, 1994, p. 20). This is further demonstration that the use of geographical modifiers is insufficient to mitigate the confusion.

Therefore, Plaintiff's Motion for a Stay Pending Appeal is **DENIED.** In view of the extended length of time already consumed in attempting to accommodate Plaintiff, no further delay will be permitted. After 45 days from entry of this Order, the stay previously entered in this case will be **VACATED.** During the interim period, Plaintiff is specifically enjoined from the use of "Sun Life of America" or "Sun Life" in its consumer advertising.

## IV. CONCLUSION

Accordingly, based on the foregoing analysis, Plaintiff's Motion to Alter or Amend Judgment [# 187–1] is **DENIED AS MOOT.** Plaintiff's Motions for Stay Pending Appeal [# 187–2], and for New Trial [# 188–1] are **DENIED.** Therefore, forty-five (45) days from entry of this Order, the stay previously entered in this case will be **VACATED.** During the interim period, Plaintiff is specifically enjoined from the use of "Sun Life of America" or "Sun Life" in its consumer advertising. Defendant's Motion for Leave to File a Further Response [# 193–1] is **GRANTED.** Defendant's Emergency Motion to Vacate [# 204–1] is **DENIED AS MOOT.**

**SO ORDERED**, this 7th day of June, 1995.